**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John Michael Dutton, et al., | No. CV-18-01425-PHX-SMB |
| Appellants, | **ORDER** |
| v. | |
| Rhea Fisher, et al., | |
| Appellees. | |

Appellants John Michael Dutton and Evelyn Marie Dutton (collectively, "Appellants" or the "Duttons") appeal the bankruptcy court's decision granting Appellees Rhea and Wilfred Fisher ("Appellees" or "Fishers") a claim in the amount of $163,000, inclusive of pre and post judgment interest. (Doc. 13, "Op. Br."; *see also* Doc. 1 (Transmittal of Appeal)). Appellees responded (Doc. 19, "Resp.") and Appellants replied. (Doc. 23, "Reply"). The underlying dispute concerns a contested financial arrangement between an elderly couple and their daughter and son in-law. In a doomed transaction, the Fishers traded a $120,000 down payment on a communal residence to house both couples for an assurance the Duttons would provide palliative care to the elderly couple, beginning a series of conflicts that resulted in the below challenge to Appellants' bankruptcy filing. For the reasons that follow, the Bankruptcy Court's order is affirmed.

**I.      BACKGROUND**

    **a.  Factual Background**

Prior to the events giving rise to the underlying bankruptcy challenge, Rhea and

Wilfred Fisher, an elderly couple married since 1968, lived together in a home they owned in Bountiful, Utah. (Doc. 1 at 12; Bk. Order at 2.) [1] However bountiful their surroundings, as the couple entered their ninth decade of life age had begun to take its toll on Wilfred. (*Id.*) Wilfred's health and mental capacity showed signs of deterioration since at least 2010 and, by 2014, Wilfred "had lost his ability to take care of himself[,]" leaving Rhea as his primary caretaker. (*Id.*) The physical demands of Wilfred's care, proved to be too great for Rhea, whose difficulties in moving Wilfred occasionally resulted in accidents or required the neighbors' assistance. (*Id.*) Unable to provide adequate care, Rhea Fisher looked to her family for help. (*Id.*) The Fishers' marriage had produced no children of their own, but each partner brought five (5) children to the marriage. (*Id.*) This case concerns one of those children, Evelyn, and her husband, John Dutton. (*Id.*) Evelyn, one of Rhea's five (5) daughters, married John Dutton in 2006. (*Id.*) Although the pair divorced in 2011, they continued to live together in a home they owned in Phoenix, Arizona. (*Id.*) Eventually, the Duttons agreed to "pool resources" with the Fishers "and buy a home together" in Arizona, one suitable for both families to reside. (*Id.*) The two couples settled on an arrangement. The Duttons would provide the Fishers with "daily living assistance, such as meals, medication, management, bathing, dressing, transportation, and a home to dwell for the rest of their lives." (*Id.* at 3-4.) The Fishers, in turn, would furnish the down payment for the purchase of the new house. (*Id.*) Evelyn then found a house that fit the bill, the "Maricopa House." (*Id.*) However, John alone entered into a purchase agreement for the new home. (*Id.*) On June 14, 2014, the Fishers sold their Utah home, netting approximately $185,000 from the sale, and briefly moved in with the Duttons in Phoenix. (*Id.*) The situation soured shortly after their arrival. (*Id.*) The Fishers provided $120,000 of the Utah House sale proceeds for the entirety of the down payment on the Maricopa House. (*Id.*) Rheas relationship with her daughter, Evelyn, thereafter "fell apart." (*Id.*) Regardless, escrow closed on the Maricopa House on June 30, 2014. (*Id.* at 5.) Rhea then moved into the Maricopa House, leaving Wilfred with the

---

[1] The Bankruptcy Court's Order is cited within the transmittal of appeal (Doc. 1 at 11-35) as Doc. 106 and within this Order as "Bk. Order."

Duttons in the Phoenix residence, which remained on the market, sold. (*Id.*)

The relationships deteriorated further when, after the Fishers loaned $60,000 to one of Rhea's grandchildren, Jaret Krum, Evelyn Dutton took Wilfred to the local branch of a Chase Bank ("Chase") where the Fishers held a joint a checking account (the "Joint Account"). (*Id.*) After speaking with Wilfred and Evelyn, the Chase employee determined that Wilfred was suffering from "elder abuse" at the hands of his wife, Rhea Fisher. (*Id.*) But, because Wilfred was a "vulnerable adult," who could not control the Joint Account funds by himself, the employee replaced Rhea with Evelyn as a signatory for a new account, into which Chase transferred all the Joint Account funds. (*Id.*) Rhea was not informed. (*Id.*) After discovering the Joint Account was closed while attempted to buy groceries, Rhea contacted Chase, uncovered the allegations that she abused Wilfred, and contacted Evelyn attempting to regain control of the funds. (*Id.*) With the assistance of another daughter, Pauline, Rhea went to the Phoenix House and unsuccessfully attempted to remove Wilfred from Evelyn's control. (*Id.* at 6.) Eventually, after trying to recover Wilfred once more and finding the Phoenix house empty, Rhea and Pauline sought police assistance. (*Id.*) They thereafter obtained a protective order against Evelyn and, escorted by police, successfully removed Wilfred from Evelyn's control at the Phoenix House. (*Id.*) Together, Rhea and Wilfred reversed the changes to their Chase Joint Account and left Arizona, moving in with Pauline briefly in California before eventually settling in Montana with another of Rhea's daughters, April Fulbright. (*Id.*) Wilfred died at eighty-six years of age in January of 2017. (*Id.* at 1.) According to the record, Rhea resides with April in Montana to this day. (*Id.* at 6.)

The Duttons closed the sale on the Phoenix House and moved into the Maricopa House following the Fishers' departure. (*Id.*) Within a few months, the Duttons refinanced the Maricopa House mortgage twice, borrowing almost $70,000 against the equity created by the down payment the Fishers provided. (*Id.*).

  **b. Procedural Background**

In 2014, the Fishers filed a state court action in Maricopa County Superior Court

alleging claims for breach of contract, fraud, unjust enrichment, and violation of duty to a vulnerable adult, seeking a judgment in the amount of the down payment plus pre and post judgment interest and the imposition of a constructive trust to secure the judgment. (*Id.*) But, on April 13, 2016 John and Evelyn Dutton (collectively, the "Duttons") filed separate voluntary petitions for bankruptcy relief under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and successfully stayed the Fishers' state court action. (*Id.* at 7.) In response, Rhea and Wilfred Fisher (collectively, the "Fishers") filed separate identical adversary complaints against the Duttons individually. The Bankruptcy Court consolidated the adversary proceeding and held a two-day trial on February 13 and 14, 2018. (Bk. Order at 2.) After taking the parties' arguments and testimony under consideration, the Bankruptcy Court entered judgment in favor of the Fishers and granted them: (1) a non-dischargeable judgment against the Duttons jointly and severally in the principal amount of $120,000; (2) pre-judgment interest in the amount of $43,000 pursuant to A.R.S. § 44-1201(A); (3) post-judgment interest to accrue against the non-dischargeable judgment amount of $163,000; and (4), imposing a constructive trust on the Duttons' Maricopa House in favor of the Fishers for the entire sum. (Doc. 1 at 8-9.) On May 8, 2018, the Duttons appealed that order, arguing the Bankruptcy Court committed clear error by holding that a preponderance of the evidence supported that the debt in question was not dischargeable pursuant to Section 523(a)(2)(A) of the Bankruptcy Code.

## II.  STANDARDS OF REVIEW

Rule 8013 of the Federal Rules of Bankruptcy Procedure states:

> "On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."

Fed. R. Bankr. P. 8013.  Accordingly, the Court reviews the Bankruptcy Court's

conclusions of law de novo and findings of fact for clear error. *See In re Lazar*, 83 F.3d 306, 308 (9th Cir.1996). A factual finding is clearly erroneous if an appellate court, after reviewing the record, has a firm and definite conviction that a mistake has been committed. *United States v. Hinkson*, 585 F.3d 1247, 1260 (9th Cir. 2009). Thus, assuming the Bankruptcy Court applied the appropriate standard in the first instance, a district court reviews whether the application of the facts to relevant law was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.* at 1263 (determining that "[i]f any of these three apply, only then are we able to have a "definite and firm conviction" that the district court reached a conclusion that was a mistake or was not among its permissible options, and thus that it abused its discretion by making a clearly erroneous finding of fact.") (internal quotation marks omitted). In that review, a court accords "particular deference to the bankruptcy court's credibility findings given the bankruptcy court's ability to view firsthand the witnesses' demeanor and tone on the witness stand." *In re McClain*, No. AP 1:14-AP-01058-VK, 2017 WL 3298418, at *4 (B.A.P. 9th Cir. Aug. 2, 2017) (citing *Retz v. Samson (in re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010)).

### III.   DISCUSSION

Both the Court and parties agree the bankruptcy court identified and applied the correct legal standard in holding that the Appellants' asset in question, a $163,000 interest secured by a constructive trust on the Maricopa House, was non-dischargeable. (Doc. 1 at 8-9.) That is, while Appellants now challenge the Bankruptcy Court's conclusion, they concede that the "standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard." *Grogan v. Garner*, 498 U.S 279, 291 (1991).[2] On appeal, Appellants question whether the Bankruptcy Court correctly applied that standard to find their debt non-dischargeable by preponderance of the evidence.[3] The Court examines Appellants' specific arguments below, in turn.

---

[2] Generally, the burden of proving an exception to discharge under § 523(a)(2), (4), and (6) falls on the creditor. *See In re Niles*, 106 F.3d 1456, 1461 (9th Cir. 1997).
[3] As Appellees correctly note, five of Appellants seven issues listed in their opening brief concern this central issue. This Court thus focuses on that singular inquiry to examine

### a. Section 523(a)(2)(A)'s Exceptions to Discharge of Debt

Among other carve-outs, § 523(a)(2)(A) of the Bankruptcy Code provides exceptions from the discharge of debt for "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). To prove actual fraud and render a debt non-dischargeable under § 523(a)(2)(A), a creditor must establish: (1) that the debtor made a representation; (2) the debtor knew at the time the representation was false; (3) the debtor made the representation with the intention and purpose of deceiving the creditor; (4) the creditor relied on the representation; and (5) the creditor sustained damage as the proximate result of the representation.[4] *In re Apte*, 96 F.3d 1319, 1322 (9th Cir. 1996) (citing *In re Eashai*, 87 F.3d 1082, 1086 (9th Cir. 1996) and *In re Britton*, 950 F.2d 602, 604 (9th Cir.1991)). Finding each element satisfied by preponderance of the evidence, the Bankruptcy Court below held the debt non-dischargeable. This Court cannot locate clear error in that ruling.

### b. The Bankruptcy Court's Initial Credibility Findings

Appellants first challenge the Bankruptcy Court's preliminary findings that (1) Rhea Fisher's testimony was credible, (2) Appellants' trial testimony was not, and (3) that the "Gift Letter," wherein the Fishers gifted John Dutton $120,000 allegedly for the down payment on the Maricopa House, could not preclude the Fisher's claims. (Op. Br. at 11-13 (citing Bk. Order at 8-12).) Contrary to Appellants' position, the above findings are supported by the evidence in record.

First, the Bankruptcy Court correctly held the Gift Letter did not preclude

---

whether the Bankruptcy Court clearly erred by finding Appellants' debt non-dischargeable by preponderance of the evidence. Aside from a passing remark in their opening brief, (*see* Doc. 13 at 11), Appellants make no further mention of the two remaining issues—that the Bankruptcy Court erred by imposing a constructive trust on Appellants' property and holding Appellants jointly and severally liable to both Appellees. The Court considers those arguments waived.

[4] Appellants do not challenge, and this Court does not address, the Bankruptcy Court's holding that "[t]he Duttons' misrepresentations were the proximate cause of the damages suffered by the Fishers." (Bk. Order at 21.)

- 6 -

dischargeability analysis under § 523(a)(2)(A). As the Bankruptcy Court recognized, the Gift Letter is a pro forma document that contains no terms. (Bk. Order at 9.) At best, the Letter evidences an enforceable promise between John Dutton and his lender, not one between the Duttons and Fishers. (*Id.* at 9.) With the Gift Letter devoid of terms, the Bankruptcy Court correctly allowed parol evidence to interrogate the Fisher's allegations of fraud in the inducement. *See Pettennude v. McHenry*, No. 2:07-CV-2071-HRH, 2008 WL 11338798, at *4 (D. Ariz. Aug. 25, 2008). Examining that parol evidence, the Bankruptcy Court then made contrasting credibility findings regarding the credible testimony of Rhea Fisher, on the one hand, and the Duttons' dubious testimony, on the other. (Bk. Order at 8-12.) Appellants concede that the Bankruptcy Court "may be correct, in that the Gift Letter may not have a preclusive effect," but argue "it can certainly be used toward the totality of the circumstances" supporting the Fishers' awareness that the down payment was intended as a gift. (Op. Br. at 12.) However, even were the Court to include the Gift Letter in a totality of the circumstances approach, the Court finds that ample evidence supports the Bankruptcy Court's holding that the Gift Letter was part and parcel of the fraud.

Second, Appellants do not challenge the lower court's credibility determination regarding Rhea Fisher. Despite Appellants' attempts to undermine her credibility at trial, the Bankruptcy Court found Rhea Fisher's testimony "consistent and supported by logic and other evidence." (*Id.* at 10.) The content of the cited trial testimony generally supports that conclusion. And crucially, where the Bankruptcy Court's credibility determinations rely on observation of a testifying party, Appellants give this Court no grounds to disturb those assessments, much less overcome the "great deference" accorded the trier of facts' credibility determinations. *In re Retz*, 606 F.3d 1189, 1196 (9th Cir. 2010) (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575, 105 S.Ct. 1504, 84. L.Ed.2d 518 (1985)); (*see also* Bk. Order at 10 (concluding that "even though [Rhea] sometimes testified inaccurately about specific dates or locations . . . [o]verall she was believable and her testimony consistent").)

Third, Appellants' concerns with the Bankruptcy Court's credibility determinations fare no better. Rather than seriously grappling with the court's analysis, Appellants now attempt to selectively undermine the trial testimony that favors Appellees. In doing so, Appellants tellingly dodge the Bankruptcy Court's core analysis. That is, in the proceeding below, Appellants argued the $120,000 used for the Maricopa House down payment was an unconditional gift. (Bk. Order at 10.) The Bankruptcy Court found this contention "both logically and legally inconsistent." (*Id.*) That conclusion flowed from specific contradictions in Appellants' trial testimony which, on appeal, they do not address. (*Compare* Doc. 7-2, Tr. 57:3-4; Doc. 7-1, Tr 135:15-20 (asserting the Fishers gifted the money without conditions) *with* Doc. 7-1, Tr. 137:18-22; Doc. 7-2, Tr. 49-22-47:14 (testifying the "unconditional gift" was intended for use as down payment to secure the Fishers "a home to grow old in")). Appellants instead rest their argument on conclusions and speculation. They dismissively characterize the issue as a "red herring," conclude the evidence that the Bankruptcy Court found persuasive is insufficient, and speculate as to "[t]he more likely truth" and that is not enough to demonstrate clear error necessary to overturn the Bankruptcy Court's findings of fact. (*See* Op. Br. at 12.) Just as Appellants do not meaningfully engage the lower court's factual findings in petitioning for reversal, Appellants do not contest the lower court's legal analysis either—namely, the Bankruptcy Court's holding that because the Appellants' testimony indicated that Appellees down payment was for "the limited purpose of purchasing the Maricopa House [] with the understanding that they would have the right to live there until their death," the essential elements of an *inter vivos* gift were not satisfied. (Bk. Order at 11 (citing *O'Hair v. O'Hair*, 109 Ariz. 236, 239 (1973) (holding that such gifts require "donative intent, delivery and a vesting of irrevocable title upon such delivery").) Finally, Appellants also do not address the documented inconsistencies in John Dutton's testimony, his multiple admissions to making dubious criminal complaints, and the patently false statements he made under oath. (*See* Bk. Order at 12.) With the evidence largely supporting those findings, unchallenged by Appellants, this Court finds no error in the Bankruptcy Court's conclusion that John

Dutton's "lies in the face of undisputed evidence . . .[and] propensity to make untrue statements . . . eviscerated his credibility." (*Id.*)  Where Appellants affirmatively contest the testimony on which lower court relied, they back those challenges with unsupported assertions and without citation. (*See* Op. Br. at 12-13.)  Ultimately, the Court find little reason to doubt the Bankruptcy Court's credibility determinations; Appellants certainly do not show they are illogical, implausible, or without support in inferences that may be drawn from the facts in the record.  *Hinkson*, 585 F.3d at 1263.

### c. Misrepresentations and Fraudulent Omissions

Appellants challenge the Bankruptcy Court's holding that "the Duttons induced the Fishers to advance the Down Payment" and fraudulently omitted a material fact under §523(a)(2)(A) by failing to share their intention "to never repay the Down Payment" and, instead, "treat it as an irrevocable gift." (Bk. Order at 16-17.)  Although Appellants dispute the lower court's interpretation of specific testimony, generally, they argue that "it is impossible to find that the Duttons induced the fishers to advance the down payment with a promise to repay."  (Op. Br. at 14 (quotation marks omitted).)   But, as with their arguments above, Appellants' broadly miss the point.  In fact, the Bankruptcy Court explicitly acknowledged that the "Fishers failed to prove that Evelyn promised to repay the Down Payment as a loan in the event the plan failed."  (Bk. Order at 15.)  The court also found that April Fulbright's testimony proved an equally prescient fact: "Evelyn never intended to repay the Down Payment." (*Id.* at 16.)  Although Appellants may wish it so, the court's analysis did not end there.  Instead, the court found the first element of non-dishchargeability under § 523(a)(2)(A) satisfied on separate grounds: Evelyn and John's independent conduct constituted fraudulent omissions of material fact under § 523(a)(2)(A).  Due to their familial and fiduciary relationship, Evelyn and John had "a duty to disclose their intention" to treat the money as an irrevocable gift "to the Fishers."  (*Id.* at 16.)  They did not.  The Duttons' "failure to disclose material facts" thus constituted "a fraudulent omission" under the statute.  *See In re Harmon*, 250 F.3d 1240, 1246 n.4 (9th Cir. 2001).  Appellants do not seriously grapple with the Bankruptcy Court's fraudulent

omission analysis with which the Court finds no clear error.

### d. Knowledge of Deceptiveness

Next, Appellants argue the Bankruptcy Court leapt to the conclusion that "the Duttons' omission with regard to Rhea in conjunction with their false statements to Pauline and Fulbright prove they knew the falsity of their representations." (Op. Br. at 15 (quoting Bk. Order at 17).) This Court cannot endorse that characterization. Appellants cite concerns over Pauline's "flawed testimony" to establish clear error.[5] (*Id.*) Appellants conclusory argument falls far short of showing the lower court clearly erred in finding Pauline credible or raise any serious doubt as to the Duttons' knowledge of the deceptiveness of their fraudulent omission. (*See* Bk. Order at 15 (finding "[t]he witnesses for both the Fishers and Duttons" on the issue of the Dutton's false promises or omissions regarding the down payment "were credible").

### e. Intent to Deceive

In unequivocally finding that the "totality of the circumstances compels" the conclusion "that the Duttons intended deceive the Fishers, the Bankruptcy Court examined an array of evidence. (*Id.* at 17-19.) First, the court found the circumstantial evidence weighed against the Duttons, whose "false[] characterize[ation] [of] the Gift Letter to Rhea as a legal requirement" for purchase of the Maricopa House, "suggest[ed] a scheme for the Duttons to obtain sole ownership and control of the Fishers' property." (*Id.* at 18.) That the Duttons knew that "an appropriate transaction would have transferred at least some ownership rights to the Fishers in exchange for the Down Payment" was "most clearly evidenced by the fact that John quitclaimed title to the Maricopa House to Evelyn" (and not the Fishers) "soon after the final loan closed." (*Id.* at 19.) By refinancing twice on the Maricopa House to install a "lavish swimming pool," the Duttons raised more questions as to their intentions. (*Id.*) The court found the removal of Rhea and Evelyn's substitution in

---

[5] Although Appellants did not contest the assertions at trial, on appeal they argue that Pauline's testimony is "nothing more than a bold face lie, not supported by any factual basis or evidence," (Op. Br. at 13.) Appellants do not explain how to square that argument with the Bankruptcy Court's conclusion that Pauline's "uncontroverted testimony" documented "Evelyn's history of graft." (Bk. Order at 11.)

her place even more on the nose as "evidence of fraud." (*Id.*) With these facts unchallenged, the Bankruptcy Court's conclusion was relatively straightforward.

Appellants take issue with what the Bankruptcy Court did not expressly address. They argue that Porter's testimony, which the court found credible, "clearly showed that Rhea knew exactly what was taking place and that she was fully informed." (Op. Br. at 15.) Appellants' again fail to address the great weight of uncontroverted evidence supporting an intent to deceive the Fishers and instead, once more offer a novel interpretation of the facts and ask this Court to reverse a lower court's factual findings on that basis, the Court finds no error. Even incorporating Porter's testimony as Appellants' desire, the Court cannot conclude that testimony overcomes the Bankruptcy Court's thorough grounds for finding the requisite intent under § 523(a)(2)(A).

### f. Justifiable Reliance

Appellants likewise point to Porter's testimony as undermining the court's holding that the Fishers' reliance on the Duttons was justifiable. In doing so, the most Appellants prove is that an additional individual[6] counseled Rhea against entering into the agreement. But that does not demonstrate clear error in the Bankruptcy Court's determination. Although in normal circumstances, Porter's testimony might indicate the Fishers' reliance was less justifiable than at first glance, Appellants' argument in this regard does not address that the "Fishers were vulnerable, elderly adults" whose reliance on the Duttons stemmed from "their close familial relationship." (Bk. Order at 21.) The Court cannot say the Bankruptcy Court erred by finding the Fishers' justifiably reliance on the Duttons' false representations on those grounds.

### IV. CONCLUSION

Although Appellants' view of the evidence undoubtedly differs from the Bankruptcy Court's factual findings, not once does that difference of opinion leave this Court with a firm and definite conviction that a mistake was made.

---

[6] The uncontroverted trial testimony also establishes that Pauline, on many occasions, warned the Fishers against the transaction. (*See e.g.,* Doc. 7-1 at 71:12-72:2, 73:15-22.)

Accordingly,

**IT IS ORDERED** AFFIRMING the decision of the Bankruptcy Court.

Dated this 28th day of July, 2020.

_____
Honorable Susan M. Brnovich
United States District Judge